# EXHIBIT 2

# Declaration of FBI Special Agent Robert A. Lyons, Jr.

## DECLARATION OF FBI SPECIAL AGENT ROBERT A. LYONS, JR.

I, ROBERT A. LYONS, JR., being duly sworn, deposes, and states as follows:

### INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and I am empowered by federal law to investigate and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7).

2. I have been employed as a Special Agent of the FBI after graduating from New Agents' Training at the FBI Academy in Quantico, Virginia in January 2013. I am currently assigned to the Albany Field Office, Binghamton Resident Agency, where I conduct criminal investigations for violations of Title 18 and 21 of the United States Code with an emphasis on bank robbery, controlled substances, criminal enterprises, street gangs, crimes against children, child sex trafficking, and other violent crimes. Prior to my employment with the FBI, I was employed as a Prosecutor's Detective with the Passaic County Prosecutor's Office in Paterson, New Jersey for six years during which time I gained extensive training and investigative experience conducting criminal investigations into the sexual molestation and physical abuse of minor children under the age of eighteen.

3. I have been provided with and read the Memorandum in Support of Defendant's Omnibus Pretrial Motions prepared by George F. Hildebrandt, Esq., and the Declaration in Support of Motion to Suppress Evidence filed by the defendant, Daniel Beal (hereafter, "Mr. Beal".) This affidavit is submitted for the limited purpose of responding to those filings. However, this affidavit only seeks to address issues raised surrounding the interaction and interview of Mr. Beal at Dacobe Enterprises on July 29, 2015. To be clear, I was not involved in the investigation that led to the acquisition of the federal search warrant for Dacobe Enterprises in Utica, New York on July 21, 2015.

4. The FBI, Albany Field Office, Syracuse Resident Agency, obtained a federal search warrant authorizing the search of a small business, Dacobe Enterprises, in Utica, New York, on July 21, 2015. During the operational briefing prior to the execution of the federal search warrant on the morning

1

of July 29, 2015, I was advised by the case agent, FBI Special Agent Heather Weber, regarding the nature of the investigation as well as the purpose of the federal search warrant which was to search Dacobe Enterprises for evidence relating to the receipt, possession, and distribution of child pornography and to seize computers and other electronic devices described in the federal search warrant. In addition, I was also advised by Special Agent Weber that her investigation had not yet uncovered a subject at Dacobe Enterprises who downloaded the images of child pornography. As a result, the subject involved in the downloading of the child pornography images could have potentially been any current employee, former employee, customer, guest, etc. with access to an Internet capable device such as a computer or other electronic device while at Dacobe Enterprises. Toward the end of the operational briefing, I was assigned to enter Dacobe Enterprises with Special Agent Weber prior to the execution of the federal search warrant in order to gain cooperation from the owner(s) of Dacobe Enterprises and to interview the owner(s) regarding the nature of their company to include the amount of employees, the amount of computers and electronic devices in the facility, the company's Internet usage, and current network architecture.

5. On July 29, 2015, at approximately 10:23 a.m., upon arrival at Dacobe Enterprises, Special Agent Weber and I entered the main office area of Dacobe Enterprises wearing business casual clothing without any FBI or law enforcement markings, or firearms displayed. After walking through the main office door, Special Agent Weber and I were met and greeted by Dacobe Enterprises' Vice President Geoffrey Thorp. After being advised of the identities of the contacting Agents, Mr. Thorp agreed to speak with Special Agent Weber and me in private to avoid any unwanted attention. Since the main office area was extremely small and two other employees besides Mr. Thorp sat in this particular space, Mr. Thorp led Special Agent Weber and I into a large open area showroom located adjacent to the main office area. Mr. Thorp advised this showroom was used by Dacobe Enterprises to photograph and document various completed projects. In the corner of this large open area showroom was a table and three chairs in which Mr. Thorp invited Special Agent Weber and me to sit.

6. During the next half hour or so, Special Agent Weber and I explained to Mr. Thorp the nature and purpose of our visit to Dacobe Enterprises and then proceeded to interview Mr. Thorp about

the nature of his business, his current employees, the company's Internet usage, and his company's computer network configuration. As the interview transpired, Mr. Thorp advised he felt compelled to notify his co-owner and business partner, Mr. Beal, of the nature of our visit and the FBI's presence at Dacobe Enterprises. Mr. Thorp seemed somewhat concerned about how the execution of the federal search warrant might disrupt business operations. Both Special Agent Weber and I had no issue with this request and welcomed the opportunity to meet with Mr. Beal. Mr. Thorp then exited the large open area showroom without an escort from Special Agent Weber or me in order to locate Mr. Beal. To be clear, Mr. Beal was not summoned by Special Agent Weber or I and I have no knowledge regarding the manner, tone, or language Mr. Thorp used to explain to Mr. Beal why he was being asked to come to the large open area showroom. A few minutes later, Mr. Thorp returned to the large open area showroom where Special Agent Weber and I were seated and he introduced Mr. Beal to us.

7. Mr. Beal, on his own volition and without any instruction or guidance from Special Agent Weber and I, sat down in the chair previously vacated by Mr. Thorp at a table across from Special Agent Weber and I. Mr. Thorp initially stood next to the table as there were only three chairs in close proximity to the table. Mr. Beal casually sat down in the chair and placed his hands on top of the table and his legs underneath. During this initial contact, Mr. Beal was smiling, friendly, and calm. Mr. Beal was not searched for any weapons or contraband or patted down for officer safety by Special Agent Weber or me during this initial contact. After sitting down and exchanging greetings, Special Agent Weber provided Mr. Beal with her FBI issued credentials and introduced ourselves as FBI Special Agents. At that time, I advised Mr. Beal of the nature and purpose of our visit to Dacobe Enterprises. I specifically advised Mr. Beal that an individual utilizing an Internet capable computer or electronic device at Dacobe Enterprises had used peer-to-peer software to download images of child pornography. Without asking a single question of Mr. Beal, Mr. Beal voluntarily confirmed he knew why the FBI was at his place of business and that he wished to fully cooperate with Special Agent Weber and I in our investigation. Mr. Beal then asked Mr. Thorp for some privacy and requested that he leave Mr. Beal alone

with us. When Mr. Thorp departed the large open area showroom, Special Agent Weber and I proceeded to interview Mr. Beal.

8.      At the outset of the interview, Mr. Beal immediately confessed to downloading images and video files constituting child pornography from a family owned computer that contained the peer-to-peer software, Ares, that he had transported to Dacobe Enterprises and connected to the company's network. In addition, Mr. Beal made several other admissions regarding how he used the Ares software to search for images and videos of child pornography, the nature and frequency of his viewing of child pornography, and the methods he used for storing and cataloging his collection of image and video files of child pornography on his computer's hard drive. At a later point during the interview, Special Agent Weber and I asked Mr. Beal to initial and date images of child pornography that were previously downloaded from his computer by an undercover agent to indicate that the defendant had in fact personally downloaded them. Mr. Beal agreed and after reviewing the images signed them indicating that he had downloaded the images.

9.      At approximately 12:45 p.m., I exited the large open area showroom and spoke with other FBI Special Agents who were in the process of conducting the search for evidence in the main office area. During this brief conversation, I was advised the United States Attorney's Office for the Northern District of New York had just authorized the arrest of Mr. Beal for possession of child pornography. I then re-entered the interview location and immediately informed Mr. Beal that he was now in custody and under arrest for the possession of child pornography. At that time, I began giving Mr. Beal his Miranda Rights using an FBI FD-395, Advice of Rights Form, when Mr. Beal ultimately advised me that he wished to consult with an attorney before answering any additional questions. As a result, at approximately 12:47 p.m., Mr. Beal's interview was terminated and I then searched Mr. Beal for any weapons or contraband before placing him in handcuffs. I explained to Mr. Beal the process for transporting him to the FBI Syracuse Resident Agency where he would be fingerprinted, photographed, and processed before his Initial Appearance at the United States District Court in Syracuse, New York.

10. Mr. Beal was not read his Miranda Rights at the outset of our interview because he was not in custody at that time. It was only at the conclusion of the interview, after the United States Attorney's Office for the Northern District of New York authorized the arrest of Mr. Beal, that he was advised of his Miranda Rights and taken into custody.

11. Mr. Beal confessed to the allegations under investigation at the onset of the interview without a single question being asked of him. Special Agent Weber and I did not confront Mr. Beal with any evidence of his guilt at the onset of the interview because we did not have any information or knowledge to suggest Mr. Beal was our prime subject responsible for downloading the images of child pornography. Special Agent Weber and I made no promises or threats and used no force to induce Mr. Beal to speak with us. The entire interview was conducted in a friendly manner and tone and was an open dialogue during which Mr. Beal was a voluntary and active participant. Neither Special Agent Weber nor I utilized any confrontational, coercive, or threatening language or behavior with Mr. Beal during our interview. Mr. Beal answered all of our questions and continually advised us that he was answering all of our questions without any reservations.

12. The interview was conducted at Mr. Beal's place of business, Dacobe Enterprises, in which he served as the company's co-owner and President. As the co-owner and President of Dacobe Enterprises, the facility in which the interview occurred was very familiar to Mr. Beal, more so than I who had never heard of his business or visited the facility in the past. The specific location of the interview with Mr. Beal was chosen by Mr. Thorp shortly after our arrival at Dacobe Enterprises. The interview location was a large open area showroom with at least two café style push door that did not contain any outward handles or locks. There could have been other entrances or exits to this large open area showroom location that I did not see but would have been known to Mr. Beal. The interview location was accessible by other Dacobe Enterprises employees and was not secured by FBI Special Agents standing guard outside or inside the interview location. No other FBI Special Agents or law enforcement officers were present inside the show room during Mr. Beal's interview. When Mr. Beal entered the interview location, he did not question the location and he did not request to change or move the

5

interview to another location at Dacobe Enterprises. Throughout the interview, Mr. Beal acted in a pleasant, calm, and relaxed manner.

13. The interview with Mr. Beal lasted approximately one hour and forty five minutes. This was due in large part to the conversational nature of the interview and how detailed the responses were that the defendant provided. This interview was by no means a marathon session designed to force a confession from Mr. Beal. Much like Mr. Thorp's interview, I envisioned Mr. Beal's interview being a straightforward fact finding endeavor regarding the nature, operations, employees, technology, and network architecture housed at Dacobe Enterprises. Since Mr. Beal confessed at the onset of the interview, the additional questions asked of him were simply follow-up questions based upon his admissions. As the interview transpired, Special Agent Weber and I inquired as to whether Mr. Beal needed to use the bathroom facilities. This was simply a kind and courteous gesture and not something designed to show our control or authority over Mr. Beal at that time. Mr. Beal declined our suggestion of a bathroom break but had he agreed, he would have been allowed to leave the room without question or hesitation. There were simply no ulterior motives in asking if Mr. Beal needed to use the bathroom facilities. In addition, even though Mr. Beal never specifically asked for any breaks or beverages, I provided him with a bottle of water in case he was thirsty which was, again, simply a courtesy.

14. Throughout the entirety of the interaction and interview with Mr. Beal, Special Agent Weber and I were dressed in business casual clothing with no outward FBI or law enforcement markings displayed. Although we were armed with FBI issued firearms, they remained secured inside our hip holsters and concealed from Mr. Beal's viewpoint at all times. Our weapons were never removed from their holsters at any point. Mr. Beal never asked to leave the interview location at all for any reason. In fact, Mr. Beal never expressed a desire to stop or take a break from the interview for any reason. If he had, the interview would have stopped immediately as Mr. Beal was not in custody or under arrest. Mr. Beal never asked to speak with any other individuals at Dacobe Enterprises or outside while the interview occurred including an attorney, business associate, or family member.

15. Although Mr. Beal seemed concerned about his adult son, Gregory Beal, wanting to drop of his car earlier that morning, he never asked to speak directly with his son during the entire interview. At one point Mr. Beal noted that his son may be outside waiting for him with his car at which point Agent Weber asked if he would like her or another agent to let his son know that he was busy in a meeting. Mr. Beal agreed with this course of action and at no point did he ever ask if he could leave to speak to his son face to face. Although Mr. Beal did ask to review his cellular telephone for text messages from his son, his cellular telephone was the subject of the federal search warrant that morning which authorized the seizing of electronic devices at Dacobe Enterprises. This fact was explained to him and at no time did he express any desire to check the parking lot himself for his adult son. Regardless, Special Agent Weber did exit the interview location several times to see if Mr. Beal's son was parked outside of Dacobe Enterprises and reported back to him that he was not. When Special Agent Weber returned to the interview location, she informed Mr. Beal she did not see Gregory Beal and was unable to deliver a message to him. I am now aware that at one point Special Agent Alix Skelton who participated in the execution of the search warrant did in fact have the opportunity to speak to Mr. Beal's son and advise him that his father was in a meeting.

16. I declare under the penalty of perjury that the foregoing is true and correct to best of my knowledge. Executed on May 2, 2016 at Syracuse, New York.

Sworn to before me
this 2nd day of May
2016

Notary Public
Broome County, N.Y.
Reg. No. 02LO6323805
Expires 4/27/2019
Miroslav Lovrick

Robert A. Lyons, Jr
Special Agent
Federal Bureau of Investigation

7